IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **STATE OF MARYLAND,** | * | |
| Plaintiff, | * | |
| v. | * | **CIVIL NO. JKB-17-2873** |
| **SCOTT PRUITT, et al.,** | * | |
| Defendants. | * | |

* * * * * * * * * * * *

| | | |
|---|---|---|
| **CHESAPEAKE BAY FOUNDATION, INC, et al.,** | * | |
| Plaintiffs, | * | |
| v. | * | **CIVIL NO. JKB-17-2939**<br>(consolidated with JKB-17-2873) |
| **SCOTT PRUITT, et al.,** | * | |
| Defendants. | * | |

* * * * * * * * * * * *

## MEMORANDUM

The State of Maryland filed suit against Scott Pruitt, in his official capacity as Administrator of the United States Environmental Protection Agency ("EPA"), and the EPA ("Defendants"), seeking injunctive relief related to Defendants' failure to perform a mandatory duty under the Clean Air Act, 42 U.S.C. § 7401, *et seq.* ("CAA"). The case was consolidated with a similar action filed against Defendants by Chesapeake Bay Foundation, Inc., Adirondack Council, Chesapeake Climate Action Network, Environmental Defense Fund, Environmental Integrity Project, Physicians for Social Responsibility, Chesapeake, Inc., and Sierra Club

(collectively, with Maryland, "Plaintiffs"). (Order, ECF No. 9; Order, Case No. JKB-17-2939, ECF No. 46.) The cases involve Defendants' failure to respond to and act on a petition filed by Maryland pursuant to section 126(b) of the CAA, 42 U.S.C. § 7426(b). Now pending before the Court is Plaintiffs' Motion for Summary Judgment (ECF No. 15) and Defendants' Cross-Motion on Remedy (ECF No. 26). The issues have been briefed (ECF Nos. 16, 27, 28, and 33) and no hearing is required, *see* Local Rule 105.6 (D. Md. 2016). For the reasons set forth below, Plaintiffs' Motion will be GRANTED IN PART and DENIED IN PART and Defendants' Cross-Motion will be DENIED. Pursuant to its equitable powers, the Court will enter an order requiring Defendants to take final action either making Maryland's requested finding or denying the section 126(b) petition on or before September 15, 2018.

## I. Background

The parties agree on many of the relevant facts, including the fundamental requirements of the CAA that are at issue here. The CAA requires states to regulate sources of air pollution within their boundaries to meet National Ambient Air Quality Standards ("NAAQS") established by EPA. Any area that does not meet NAAQS is designated a "nonattainment" area and those areas that do meet NAAQS are designated "attainment" areas. 42 U.S.C. § 7407(d). States also must develop and submit to EPA State Implementation Plans ("SIPs")—comprehensive emission control plans that specify how the state will achieve and maintain NAAQS within the state. *Id.* §§ 7407(a), 7410(a)(1).

In addition to achieving attainment within their boundaries, states also are obligated to ensure that sources of air pollution within their boundaries do not "contribute significantly" to nonattainment in other states. *Id.* § 7410(a)(2)(D)(i)(I). In other words, states must account for the fact that source emissions do not respect artificial boundaries and do not simply stop at state

2

lines. Rather, their impact may be felt hundreds of miles away in multiple other states. This section of the CAA is commonly referred to as the "good neighbor" provision. Not surprisingly, the Act provides recourse for those states that believe their neighbors are not fulfilling their obligations.

Section 126 of the CAA provides that,

> Any State or political subdivision may petition the Administrator for a finding that any major source or group of stationary sources emits or would emit any air pollutant in violation of the prohibition of section 7410(a)(2)(D)(ii) of this title or this section [i.e., the "good neighbor" provision]. *Within 60 days after receipt of any petition under this subsection and after public hearing, the Administrator shall make such a finding or deny the petition.*

42 U.S.C. § 7426(b) (emphasis added). If the Administrator makes a finding pursuant to § 7426(b), it is a violation of the Act "for any major existing source to operate more than three months after such finding has been made with respect to it." *Id.* § 7426(c). Alternatively, the Administrator may permit a source to continue operating past the three-month period pursuant to a schedule designed to achieve compliance through incremental progress. *Id.*

The CAA also provides that any person, including a State, "may commence a civil action . . . against the Administrator where there is alleged a failure of the Administrator to perform any act or duty under this chapter which is not discretionary." 42 U.S.C. § 7604(a)(2).

On November 26, 2016, Maryland filed a § 126(b) petition with EPA, requesting that the Administrator make a finding that 36 electric generating units ("EGUs") located in five different states (Indiana, Kentucky, Ohio, Pennsylvania, and West Virginia) are violating the good neighbor provision of the CAA. (Maryland § 126(b) Petition, ECF No. 1-1.) Specifically, the petition contends that the 36 EGUs are emitting nitrogen oxides in a manner that significantly contributes to Maryland's nonattainment of the 2008 Ozone NAAQS. (*Id.*) On January 3, 2017, Defendants granted themselves a six-month extension to respond to the petition pursuant to 42

3

U.S.C. § 7607(d)(10). Defendants, however, did not hold a public hearing or otherwise act on Maryland's petition within the new deadline.

On July 20, 2017, Maryland provided notice to Defendants that it intended to file suit against them pursuant to the CAA's citizen suit provision, 42 U.S.C. § 7604(a)(2). The plaintiffs in Case No. 17-2939 likewise provided notice to Defendants of their intent to file suit based on the Administrator's failure to perform a nondiscretionary duty. After waiting the requisite sixty days following their notice to Defendants, *see* 42 U.S.C. § 7604(b)(2), Plaintiffs filed the instant consolidated civil actions.

## II. Legal Standard

A party seeking summary judgment must show "that there is no genuine dispute as to any material fact" and that it is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The burden is on the moving party to demonstrate the absence of any genuine dispute of material fact. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). If a party carries this burden, then the court will award summary judgment unless the opposing party can identify specific facts, beyond the allegations or denials in the pleadings, that show a genuine issue for trial. Fed. R. Civ. P. 56(e)(2). The court will assess the merits of the motion, and any responses, viewing all facts and reasonable inferences in the light most favorable to the party opposing the motion. *Scott v. Harris*, 550 U.S. 372, 378 (2007); *Iko v. Shreve*, 535 F.3d 225, 230 (4th Cir. 2008).

## III. Analysis

Defendants concede at the outset that they are required by the CAA to either grant or deny a petition like the one filed by Maryland within a specified time period. Defendants also concede that they failed to carry out this nondiscretionary duty. The parties also agree that the Court has

jurisdiction "to order the Administrator to perform [a nondiscretionary] duty."[1] 42 U.S.C. § 7604(a); *see, e.g., Sierra Club v. Johnson*, 444 F. Supp. 2d 46, 52 (D.D.C. 2006). The Court agrees. Accordingly, Plaintiffs are entitled to summary judgment and an injunction compelling Defendant Pruitt to perform his nondiscretionary duty under the CAA to hold a public hearing and grant or deny Maryland's § 126 petition. *See Am. Lung Ass'n v. Browner*, 884 F. Supp. 345, 346 (D. Ariz. 1994) (finding summary judgment appropriate "where, as here, it remains only for

---

[1] Defendants also do not challenge the Court's jurisdiction based on Plaintiffs' standing, or, more accurately, lack thereof. However, because Plaintiffs spend a significant portion of their brief discussing standing, and because the Court is under an independent duty to ensure its jurisdiction, the Court briefly notes that it does indeed have jurisdiction. To demonstrate standing, a plaintiff must show that: (1) he has suffered an injury in fact; (2) the injury is fairly traceable to the defendant's actions; and (3) the injury is likely to be redressed by a favorable decision of the court. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). The injury alleged must be "concrete and particularized" as well as "actual and imminent," rather than speculative. *Id.* at 560.

There is no doubt that Maryland has standing to bring this suit. First, Maryland has plausibly alleged that the thirty-six EGUs in upwind states emit air pollution that harms the state and its citizens. Second, Maryland has plausibly alleged that this harm is ongoing and is directly attributable to Defendants' failure to address its petition. Finally, Maryland has plausibly alleged that a favorable decision from Defendants would redress its injuries by allowing the state to meet its obligations under the CAA and alleviating the negative health consequences to its citizens. Moreover, Maryland has asserted a valid procedural right to protect the above substantive interests, and that right has been deprived by Defendants' failure to hold a hearing and issue a decision in response to Maryland's petition. *See Lujan*, 504 U.S. at 572 n.7.

The plaintiff organizations from Case No. 2939 must also have standing, however. *See, e.g., Johnson v. Manhattan Ry. Co.*, 289 U.S. 479, 496–97 (1933) ("[C]onsolidation is permitted as a matter of convenience and economy in administration, but does not merge the suits into a single cause, or change the rights of the parties, or make those who are parties in one suit parties in another."); *accord Cole v. Schenley Indus., Inc.*, 563 F.2d 35, 38 (2d Cir. 1977); *see also Scurmont, LLC v. Firehouse Rest. Grp., Inc.*, No. 4:09-CV-618-TLW-TER, 2010 WL 11433200, at *2 (D.S.C. Jan. 8, 2010). The plaintiff organizations argue that they have both organizational standing (i.e., standing to sue on their own behalf) and associational standing (i.e., standing to sue on behalf of their members). The Court need address only the latter of these two bases for standing. An organizational plaintiff has standing to bring suit on behalf of its members when: "(1) its members would otherwise have standing to sue as individuals; (2) the interests at stake are germane to the group's purpose; and (3) neither the claim made nor the relief requested requires the participation of individual members in the suit." *White Tail Park, Inc. v. Stroube*, 413 F.3d 451, 458 (4th Cir. 2005) (quoting *Friends for Ferrell Parkway, LLC v. Stasko*, 282 F.3d 315, 320 (4th Cir. 2002)). The Chesapeake Bay Foundation has submitted declarations from two of its members and from its Vice President of Environmental Protection and Restoration. The individual members declare that they suffer from respiratory conditions that are exacerbated by ozone. The organization declares that it is "dedicated solely to restoring and protecting the Chesapeake Bay" and improving its water quality through advocating for the reduction of pollutants in the Bay, including nitrogen that enters the bay as a result of $NO_x$ emissions. (ECF No. 16-1 ¶ 6–8.) These declarations satisfy the first two requirements for associational standing. Moreover, participation of individual members is not necessary in a case such as this that presents a pure question of law (i.e., Defendants' obligations under the CAA). Accordingly, the Court finds that the Chesapeake Bay Foundation has standing. The Court need not consider whether any of the other plaintiff organizations have standing because "the presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement." *Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 53 n.2 (2006).

the Court, acting in its discretion, to fashion an equitable remedy"); *Sierra Club v. Ruckelshaus*, 602 F. Supp. 892, 898 n.9 (N.D. Cal. 1984) (granting summary judgment and rejecting EPA's argument that dispute over appropriate equitable remedy for its breach of mandatory statutory duty presents material question of fact).

However, one issue still remains to be resolved: By when must the Administrator take final action on the petition? Although Defendants do not contest their liability, they do object to the remedy sought by Plaintiffs. Plaintiffs request that the Court order Defendants to hold a public hearing and either grant or deny Maryland's petition within sixty days of the Court's order. Defendants, on the other hand, contend that it is infeasible for them to issue a final decision on Maryland's petition any sooner than December 31, 2018. Defendants, however, commit to taking final action on or before that date.

Where, as here, an agency has failed to meet the statutory deadline for a nondiscretionary act, "[a] court appropriately may decline to impose an immediate deadline . . . and may afford an agency additional time for compliance." *Johnson*, 444 F. Supp. 2d at 52. "[T]he court may exercise its equity powers 'to set enforceable deadlines both of an ultimate and an intermediate nature [.]'" *Id.* (alteration in original) (quoting *NRDC v. Train*, 510 F.2d 692, 705 (D.C. Cir. 1974)). Indeed, "[t]he sound discretion of an equity court does not embrace enforcement through contempt of a party's duty to comply with an order that calls him 'to do an impossibility.'" *Train*, 510 F.2d at 713 (quoting *Maggio v. Zeitz*, 333 U.S. 56, 59 (1948)). Moreover, "it would be inappropriate to set an infeasible schedule in order to punish a delinquent agency." *Sierra Club v. Thomas*, 658 F. Supp. 165, 172 (N.D. Cal. 1987). Put simply, the Court should not and will not order Defendants to do that which is impossible or infeasible

The Court, however, must not relieve Defendants of their mandatory duty lightly. *See Train*, 510 F.2d at 713 ("An equity court can never exclude claims of inability to render absolute performance, but it must scrutinize such claims carefully since officials may seize on a remedy made available for extreme illness and promote it into the daily bread of convenience."). Rather, the Court "must scrutinize carefully claims of impossibility, and 'separate justifications grounded in the purposes of the Act from the footdragging efforts of a delinquent agency.'" *Johnson*, 444 F. Supp. 2d at 53 (quoting *Train*, 510 F.2d at 713).

Accordingly, Defendants bear "a heavy burden to demonstrate the existence of an impossibility." *Alabama Power Co. v. Costle*, 636 F.2d 323, 359 (D.C. Cir. 1979). This burden is especially heightened where "the agency has failed to demonstrate any diligence whatever in discharging its statutory duty." *Thomas*, 658 F. Supp. at 172. To satisfy this burden, the Administrator must show not only that he has acted in good faith, but that he has "employed the *utmost diligence* in discharging his statutory responsibilities." *Johnson*, 444 F. Supp. 2d at 52–53 (emphasis added) (quoting *Train*, 510 F.2d at 713).

Notably, an agency's desire for additional time to gather information or "improve the quality or soundness" of its decision is not a sufficient basis for delay. *Id.* at 53–54; *Sierra Club v. Gorsuch*, 551 F. Supp. 785, 788–89 (N.D. Cal. 1982) (noting that "EPA envisions a level of thoroughness and scientific certainty not within the contemplation of Congress at the time it mandated the regulation of hazardous air pollutants"). Nor is it sufficient for an agency to simply point to competing regulatory priorities to justify its noncompliance with statutory deadlines. "If Congress formulates policies and programs to meet specific problems, it may also establish their relative priority for the Nation. In such a situation, the court's role is to enforce the legislative will when called upon to do so." *New York v. Gorsuch*, 554 F. Supp. 1060, 1062–

63 (S.D.N.Y. 1983) (citation omitted); *see also NRDC v. Reilly*, 797 F. Supp. 194, 197 (E.D.N.Y. 1992) ("EPA's generalized complaints both that the guidelines are complex and of enormous scope and that there are competing demands on their resources, do not amount to a claim of impossibility sufficient to justify a departure from a Congressional mandate."). Indeed, "shifting resources in response to statutory requirements and court orders is commonplace for EPA." *Thomas*, 658 F. Supp. at 174.

The deadline set by the CAA has long since passed. So too has the extended deadline EPA set for itself. Moreover, Defendants contend that even now, more than a year after the statutory deadline has passed, a new sixty-day deadline remains unreasonable. In support of this position, Defendants have submitted a lengthy declaration from Peter Tsirigotis, the Director of the Office of Air Quality Planning and Standards (OAQPS), Office of Air and Radiation (OAR) at EPA. Mr. Tsirigotis's arguments in favor of Defendants' timeline essentially fall into three categories.

First, Mr. Tsirigotis talks at great length about the complexity of evaluating the source of ground-level ozone. Ozone is a "secondary air pollutant" that forms as a result of chemical reactions that often take place hundreds of miles from the emission source.[2] As a result, EPA historically has attempted to address interstate transmission of ozone through regional rulemakings. These regional rulemakings have analyzed ozone precursor emissions only at a statewide level. Accordingly, "EPA has not previously established policies and a methodology for evaluating whether *individual* sources . . . are significantly contributing to nonattainment or

---

[2] According to Mr. Tsirigotis, "[g]round-level ozone is not emitted directly into the air, but is a secondary air pollutant created in the lower atmosphere by chemical reactions between oxides of nitrogen ("NOx"), carbon monoxide ("CO"), methane ("$CH_4$"), and non-methane volatile organic compounds ("VOCs") in the presence of sunlight." (Tsirigotis Decl., ECF No. 27-1, ¶ 12.)

interfering with maintenance for an ozone NAAQS in a downwind state in violation of the [good neighbor provision]."[3] (*Id.* ¶ 22 (emphasis added).)

Second, Mr. Tsirigotis provides insight into EPA's internal procedure for evaluating the petition. For instance, he notes that EPA staff have been reviewing the petition for "some months." (*Id.* ¶ 28.) And he explains that the issues presented in the petition "will be raised to senior management in an organized process." (*Id.* ¶ 31.) Moreover, he notes that "EPA may grant or deny the petition based on technical or policy factors from other existing programs or policies related to interstate transport of ozone." (*Id.* ¶ 29.) Additionally, if EPA determines that some or all of the 36 EGUs are operating in violation of the good neighbor provision, it will need "to develop emission limits and compliance schedules as appropriate" to remedy the violation. (*Id.* ¶ 37.) Finally, Defendants will need to prepare a proposed action for publication in the Federal Register, hold a public hearing on that proposal, and then prepare a final Federal Register package, explaining the agency's final decision and the deliberative process it employed. Essentially, Mr. Tsirigotis describes a thorough process for fact-gathering, analysis, synthesis, presentation, policy development, and eventual action on the petition.

Third, Mr. Tsirigotis points to agency resource constraints and potential efficiencies that could be gained from Defendants' proposed timeline. He contends that "EPA is unable to perform all activities that that [sic] Congress has directed it to perform and that EPA may want to

---

[3] Plaintiffs have submitted an expert declaration contending that EPA could easily adapt its previously used methodology "to deal with the smaller group of sources presented in the Maryland 126(b) petition." (Dr. Sahu Decl., ECF No. 28-4 ¶ 5.) According to Dr. Sahu, EPA could easily apportion $NO_x$ and VOC emissions present in Maryland among the various EGUs cited in Maryland's petitions. EPA's argument, however, is broader. EPA argues not only that it must operate its modeling technology in a new way (something that apparently is not as difficult as EPA would have the Court believe), but also that it must make new policy decisions once it has obtained that data. Plaintiffs' expert seems to acknowledge as much himself, noting that EPA still must determine the threshold amount of $NO_x$ that an individual EGU must emit in order to "contribute significantly," 42 U.S.C. § 7410(a)(2)(D)(i)(I), to a downwind state's nonattainment. (ECF No. 28-4 ¶ 13.) In any event, the Court need not resolve this dispute because the merits of EPA's argument are not material. The Court has not granted EPA any additional time based on its purported need to "make new policy decisions regarding evaluating, defining, and determining the impact of a single source." (ECF No. 27-1 ¶ 30.)

9

perform, at any given time." (*Id.* ¶ 7.) Additionally, Mr. Tsirigotis notes that "EPA currently has five other section 126(b) petitions pending that ask the EPA to make similar findings regarding different states."[4] (*Id.* ¶ 32.) Defendants would like to address these petitions together to the extent practicable, especially because some petitions involve the same EGUs. Moreover, the same agency "staff, resources, and expertise must be used to assess each of these separate section 126(b) petitions." (*Id.* ¶ 51.) Accordingly, EPA believes that addressing the six petitions together will best achieve "the goal of thorough, coordinated responses" to the petitions.[5] (*Id.* ¶ 52.) Mr. Tsirigotis also points out that EPA's Office of Air and Radiation ("OAR") has a number of other mandatory "statutory and court-ordered" obligations that it must complete in 2018. (*Id.* ¶ 55.)

Mr. Tsirigotis's lengthy declaration, however, is also notable for what it does *not* say. Nowhere does Mr. Tsirigotis say that it would be impossible for EPA to render a final decision on Maryland's petition within sixty days. Perhaps more importantly, Mr. Tsirigotis provides little in the way of explanation regarding EPA's attempts, if any, to comply with its mandatory obligations. Mr. Tsirigotis simply notes that agency staff has been reviewing the petition for "some months." This is a far cry from the showing Defendants must make to satisfy their

---

[4] As of this ruling, one of those five petitions has apparently been resolved. On February 7, 2018, the District Court for the District of Connecticut issued an order in *Connecticut v. Pruitt*, Case No. 3:17-cv-00796-WWE, a case analogous to this one in which the state of Connecticut sought to compel EPA to act on its § 126(b) petition. The court in that case ordered EPA to take final action on Connecticut's petition within sixty days, the same timeline sought by Plaintiffs here. Although it is not evident from the record, the Court presumes that EPA complied with that order.

[5] Interestingly, and somewhat counterintuitively, Mr. Tsirigotis states that Defendants' proposed timeline represents "the most expeditious timeframe on which the EPA could act on Maryland's petition," yet it would also allow EPA to act on all other pending § 126(b) petitions. (Tsirigotis Decl., ¶ 52.) And he notes that a shorter timeframe would preclude EPA only from "act[ing] on the six petitions in a coordinated manner." (*Id.*) In other words, Mr. Tsirigotis seems to suggest, albeit implicitly, that EPA could in fact act on Maryland's petition in a shorter timeframe if it were not concerned with coordinating that response with the other pending § 126(b) petitions. Indeed, it seems that is exactly what EPA did with regard to Connecticut's petition when ordered to do so by a different court.

burden—that is, that the Administrator has "employed the *utmost diligence* in discharging his statutory responsibilities." *Johnson*, 444 F. Supp. 2d at 53 (emphasis added).

Rather, Defendants provide a blueprint for how they would *like* to address Maryland's petition, seemingly with little regard for how they *must* address that petition. Some common themes emerge from Mr. Tsirigotis's declaration. EPA is busy. EPA has limited resources. And EPA has many competing demands on its limited resources. Moreover, the demand at issue here—responding to § 126(b) petitions regarding ozone levels—is particularly challenging given the complex nature of measuring a given source's contribution to downwind ozone. The Court understands all of these concerns, and, were EPA granted unlimited discretion to prioritize its responsibilities, the Court would normally be loathe to presume to tell an agency such as EPA how to perform its regulatory duties.

But that is not the situation in which the Court finds itself. On the contrary, Congress has determined that the Administrator must grant or deny a § 126(b) petition within sixty days. In other words, Congress has taken the decision out of the agency's hands and so too largely out of the Court's hands. *See Johnson*, 444 F. Supp. 2d at 56 ("Although in most circumstances the Court defers to agency expertise about appropriate rulemaking procedures, such deference is inappropriate where Congress has unambiguously expressed its intent that these regulations be promulgated by a date certain and the agency manifestly has failed to fulfill this statutory obligation."); *Gorsuch*, 554 F. Supp. at 1065 ("While the Administrator should be commended for striving to develop the fullest possible statistical basis for any regulations she promulgates, that quest must give ground in favor of expedition where Congress expressly directs the Administrator to establish standards promptly."); *Gorsuch*, 551 F. Supp. at 788–89 ("[T]he EPA envisions a level of thoroughness and scientific certainty not within the contemplation of

Congress at the time it mandated the regulation of hazardous air pollutants."). In short, EPA has not shown that compliance with its statutory mandate is impossible, "only that it is always easier to do something with more rather than less time." *Ruckelshaus*, 602 F. Supp. at 899.

Notwithstanding the above, the Court is convinced that Plaintiffs' requested sixty-day timeline is too short "to afford any reasonable possibility of compliance." *Johnson*, 444 F. Supp. 2d at 58; *see NRDC v. New York*, 700 F. Supp. 173, 181 (S.D.N.Y. 1988) (noting "necessity of dealing with [similar] issues on a pragmatic basis"); *Thomas*, 658 F. Supp. at 175 ("Nevertheless, since the purpose of this order is to protect the public interest and not to punish EPA, the Court would extend EPA's time to compensate for its footdragging if it were convinced that doing so was necessary for the promulgation of workable regulations."). The notice and comment procedures that EPA is mandated to follow account for nearly sixty days alone, leaving the agency little to no time to thoughtfully review and respond to comments in its final decision.[6] Given the complexity of the issues raised in Maryland's petition and the procedural steps EPA must take—a point that Plaintiffs do not dispute[7]—the Court is convinced that sixty days is an

---

[6] First, under the CAA, EPA must hold a public hearing after its proposed resolution of the petition has been published in the Federal Register. 42 U.S.C. § 7607(d)(5). Second, EPA must keep the record open for thirty days following the hearing to provide an opportunity for interested parties to submit comments. *Id.* Moreover, the Federal Register Act sets fifteen days as the default minimum time period that is considered reasonable and sufficient to provide notice of a public hearing. 44 U.S.C. § 1508.

[7] In a number of similar cases where courts have imposed deadlines of the type sought by Maryland here, they have relied, at least in part, on expert declarations submitted by plaintiffs contending that EPA could in fact act in the time period sought by plaintiffs. *See Connecticut v. Pruitt*, No. 3:17CV796 (WWE), 2018 WL 745953, at *3 (D. Conn. Feb. 7, 2018) (relying on affidavit of former EPA peer reviewer who stated that "EPA could act upon the State of Connecticut's petition within 60 days"); *Sierra Club v. Thomas*, 658 F. Supp. 165, 172 (N.D. Cal. 1987) (considering declaration of former Assistant Administrator for Air, Noise, and Radiation at EPA, "that EPA in the past ha[d] completed regulatory tasks of similar complexity" in the statutorily allotted time period as "persuasive evidence" that such a timeline was "feasible"). Here, Plaintiffs have submitted an expert declaration that questions EPA's proposed timeline and the justification for it. (Dr. Sahu Decl., ECF No. 28-4, ¶ 5 (opining that "EPA is well equipped to quickly analyze Maryland's 126(b) petition . . . using its current methodology— and without having to invent new methodology or new policy— . . . in a much faster and shorter time period than the year-long timeline proposed by EPA").) However, unlike the experts in the cases cited above, Plaintiffs' expert does not affirmatively contend that EPA could decide Maryland's petition *within sixty days*. Rather, he states that EPA could "save months of time in the proposed remedy schedule." (ECF No. 28-4 ¶ 12.)

insufficient amount of time for Defendants to render an informed decision. Unlike the Connecticut petition that EPA was ordered to decide in sixty days, which identified only *one* upwind EGU, Maryland's petition identifies *thirty-six* EGUs in five different states. Indeed, even Congress seems to have recognized that the sixty-day deadline it imposed may be inadequate in many instances. *See* 42 U.S.C. § 7607(d)(10) (allowing agency to extend its deadline to six months where "necessary to afford the public, and the agency, adequate opportunity to carry out the purposes of this subsection").[8]

The Court finds that the appropriate schedule lies somewhere between the requests of the parties. According to Defendants' proposed scheduled, as of now they should have already developed a proposed action on Maryland's petition. (ECF No. 27-1, at 6.) Moreover, Defendants should be in the midst of publishing their proposed action (if they have not already) in the Federal Register. (*Id.*) Going forward, Defendants proposed a public hearing date of July 2, 2018, to be followed by a forty-five day public comment period. (*Id.*) The Court believes these timelines are appropriate. The Court, however, believes that Defendants have allotted themselves an excessive amount of time to take final agency action following receipt of public comments, especially in light of Defendants' dilatory approach to date. Adopting Defendants' proposed timeline "would effectively amount to condoning a fully discretionary approach to a nondiscretionary duty." *Sierra Club v. Browner*, 130 F. Supp. 2d 78, 95 (D.D.C. 2001), *aff'd sub nom. Sierra Club v. Whitman*, 285 F.3d 63 (D.C. Cir. 2002). Accordingly, the Court will order that Defendants sign a notice taking final agency action on Maryland's petition on or before

---

[8] Of course, EPA granted itself such an extension and appears to have made little, if any, effort to comply with its own extended deadline. Although Defendants' apparent disregard for their statutory obligations are disconcerting, it is not the Court's responsibility to punish them for their past dilatory conduct. *See, e.g., Thomas*, 658 F. Supp. at 171 (noting that "it would be inappropriate to set an infeasible schedule in order to punish a delinquent agency"). Rather, the Court must determine, from this point forward, a pragmatic, reasonable schedule for Defendants to comply with their mandatory statutory duty.

September 15, 2018 (i.e., thirty days after the end of the public comment period and approximately 90 days from the Court's ruling).

In closing, the Court notes that it does not grant the above extension lightly. On the contrary, the Court is troubled by EPA's apparent unwillingness or inability to comply with its mandatory statutory duties within the timeline set by Congress. If EPA and the Administrator believe the timelines set by the CAA are unreasonable, they should seek an extension from Congress (in the form of an amendment), not through the courts.[9] EPA and the Administrator may not take seriously the deadlines set by Congress, but this Court expects and demands that they take seriously the deadlines set by it. Accordingly, Defendants are hereby placed on notice that no further delays will be tolerated nor extensions granted.

## IV. Conclusion

For the foregoing reasons, an Order shall enter GRANTING IN PART and DENYING IN PART Plaintiffs' Motion for Summary Judgment and DENYING Defendants' Cross-Motion on Remedy.

---

[9] This Court is far from the first, and unfortunately unlikely to be the last, to clarify for EPA the proper venue for relief from its apparently unachievable regulatory burdens. *Sierra Club v. Johnson*, 444 F. Supp. 2d 46, 57 (D.D.C. 2006) ("If the schedule set by the Clean Air Act for the regulation of these sources is unreasonable, EPA's remedy lies with Congress, not with the courts."); *Am. Lung Ass'n v. Browner*, 884 F. Supp. 345, 348 n.9 (D. Ariz. 1994) ("The EPA's relief is with Congress, not with the courts."); *NRDC v. EPA*, 797 F. Supp. 194, 198 (E.D.N.Y. 1992) ("Short of this showing [of impossibility], EPA's proper recourse is to persuade Congress to amend the statute, not to defy the statute and seek relief with this Court."); *Thomas*, 658 F. Supp. at 175 ("In the absence of a showing of impossibility, EPA must look to Congress, not this Court, for an extension of time.").

DATED this 12 day of June, 2018.

BY THE COURT:

_____
James K. Bredar
Chief Judge